FILED
U.S. DISTRICT COURT
SAVANNAH DIV.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

2006 APR 12 PM 5: 06

CLERK_____
SO. DIST. OF GA.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | INDICTMENT NO. |
| | ) | **CR306 - 10** |
| v. | ) | |
| | ) | |
| | ) | |
| | ) | **COUNT 1** |
| RICK TRIMM, SR., and | ) | 18 U.S.C. §1343 |
| RYAN DUNLAP, | ) | Wire Fraud |
| | ) | |
| Defendants. | ) | |
| | ) | |

THE GRAND JURY CHARGES THAT:

<u>COUNT 1</u>
**WIRE FRAUD**
**(18 U.S.C. § 1343)**

1.      Between on or about October 7, 2002, and on or about February 19, 2004, the
exact dates being unknown, in Laurens County, within the Southern District of Georgia, and
elsewhere, the defendants herein:

**RICK TRIMM, SR., and RYAN DUNLAP,**

aided and abetted by each other as well as others both known and unknown to the grand jury,
devised and intended to devise a scheme and artifice: (a) to defraud mortgage lenders of certain
property, specifically, money that represented the proceeds of home refinance loans; and (b) for
obtaining money and property by means of materially false and fraudulent promises, pretenses,
representations, and omissions, specifically, money representing the proceeds of home refinance
loans.

## THE SCHEME TO DEFRAUD AND OBTAIN MONEY BY FALSE AND FRAUDULENT PRETENSES

2.      Defendant, **RICK TRIMM, SR.,** worked as General Sales Manager for Legacy Mobile Homes, located at 2055 Highway 441 South, Dublin, Georgia, at all relevant times.  As General Sales Manager, **TRIMM** regularly sold mobile homes to customers looking to purchase "land-home packages," that is, mobile homes coupled with a specified parcel of land on which such a home could be placed.  To facilitate the customers' purchase of these land-home packages, **TRIMM** helped arrange financing for the transactions by contacting Defendant **RYAN DUNLAP**, a mortgage broker who operated Heart of Georgia Financial Services, located at 212 W. Jackson Street, Dublin, Georgia.  **DUNLAP** was responsible for collecting information from consumers and then submitting Uniform Residential Loan Applications ("URLAs) to lenders in order to secure loans for the land-home packages.

3.      The lenders to whom the loan applications were submitted considered a number of factors in deciding whether to approve a prospective buyer for a mortgage loan including the buyer's income, asset-to-debt ratio, and credit history.  Another critical factor these lenders considered in approving a loan was the "loan-to-value" ratio, that is the value of the loan as a percentage of the value of the property for which the loan was to be given.  In order to determine the market value of the property as part of loan-to-value assessment, these lenders required the loan applicant to secure an appraisal from a licensed real-estate appraiser.  The lenders also required a putative homeowner to obtain homeowner's insurance before the loan could be closed.  In addition, before it would issue a loan on a property, many of the lenders required the loan applicants to obtain a "title insurance commitment" from the closing attorney.  That is, the

2

attorney would have to verify that the title to the property that was the subject of the loan would be transferred to the buyer of the property at closing.

      4.     If a consumer was seeking a "refinance" loan – a loan where the property owner takes out a second loan on a property that is used to pay off the first loan (and gain a more favorable rate of interest or reap the benefits of any equity), the lenders required the loan applicant to obtain a "verification of mortgage" from the holder of the first mortgage that substantiated the fact that there was in fact a mortgage and the amounts owed on such a mortgage.  In addition, the lenders required the loan applicant to obtain a title insurance commitment that showed that the loan applicant already had title to the subject property.  The lender then used the proceeds of the mortgage loan to pay off any existing mortgages before providing any money to the consumers.  The lender also required that any security deeds relating to the first mortgage be cancelled upon closing of the second loan.

      5.     In order to obtain pre-approval for loans, the mortgage broker, Heart of Georgia Financial Services, would submit a "Uniform Residential Loan Application ("URLA") from the proposed buyer along with a copy of his or her credit report.  The URLA asked the applicant to provide a host of information, including the borrower's name, address, and length of residency at that address.  It also required the borrower to list his or her source and amount of income, assets and liabilities, and monthly expenses.  In addition, the form required the borrower to list a  legal description of the subject property, the amount of the proposed loan, and the purpose of the loan (i.e., whether the loan was a "purchase," "refinance," "construction," etc.).  With respect to "refinance" loans, the URLA also asked the applicant to disclose the year the property was acquired, along with the dollar value of any existing liens on the property.

3

6.     If, based upon an examination of the URLA and the credit reports, the lenders determined that a loan application satisfied their criteria, the lender would provide Heart of Georgia with a pre-approval letter for the applicant.  The lender, however, required that the information in the URLA be verified before final approval could be given.  As part of the verification process, the mortgage broker was responsible for submitting supporting documentation to the lender on behalf of the applicant, such as documents verifying the applicant's income (tax returns, W-2 forms, etc.).  In addition, the broker, Heart of Georgia, was responsible for obtaining title commitment insurance from the closing attorney and an appraisal on the property.  In this case, Swain Alvin "Al" Lewis supplied Heart of Georgia with title commitments which purported to list the actual titleholder to the subject properties.

7.     If the supporting documentation, including the appraisal and title commitment, substantiated the information in the URLA, the lenders generally approved the loans.  The lenders would then provide the closing attorney, in this case, Al Lewis, with instructions on closing the loan.  The closing attorney would then be responsible for having the parties sign the settlement statement (the statement that gives a complete breakdown of the costs involved in the transaction) and any other documents necessary to consummate the loan.  Lewis was also responsible for filing security deeds on behalf of the lender.  In addition, Lewis was responsible for disbursing the proceeds of the loan.

8.     For providing services as a mortgage broker, Heart of Georgia. was compensated by the applicant from the loan proceeds.  The applicant was responsible for paying "brokerage fees" and "processing fees" that amounted to roughly three percent of the value of the loan.  The bulk of the loan proceeds were used to pay the mobile home dealer, Legacy Mobile Homes, the

4

purchase price of the properties.

## OBJECT OF THE REFINANCE SCHEME

9.       It was part of the scheme and artifice to defraud mortgage lenders and obtain

money from those lenders by means of materially false pretenses, representations, promises, and

omissions that the Defendants falsely couched mortgage loans as "refinance" loans rather than

"original purchase" loans in order to sell more mobile homes and collect more loan fees.  Many

of those who purchased manufactured homes from the sellers described herein were poor and

uneducated.  These individuals generally possessed poor credit histories and were only able to

qualify for mortgage loans with a low loan-to-value ratio, particularly with respect to loans for

manufactured housing.  In order to qualify for an original purchase loan on a manufactured home,

the buyers would have had to make a substantial down payment in order to bring the loan-to-

value ratio down so that the lenders would be willing to accept the risk of default.

10.       Defendants **TRIMM** and **DUNLAP** knew that the individuals who wanted to

purchase these mobile homes could not qualify for a loan without altering the loan-to-value ratio

of the transactions.  And, they knew that the purchasers of these manufactured homes were too

poor to make the sort of down payment that would lower the loan-to-value ratio of the

transactions to a level where a lender would approve the loans.  **TRIMM** and **DUNLAP** thus

knew that in order to qualify these individuals for a loan, they would have to make the lenders

falsely believe that property purchased for one price was significantly more valuable than the

actual purchase price, thereby altering the lender's perception of the value of the loan in relation

to the value of the property.  For example, someone with poor credit who lacked the money to

make a down payment on a $55,000 mobile home could not qualify for the $55,000 needed to

purchase the mobile home unless the lender believed that the property was worth substantially

more than $55,000 because only then would the value of the loan be far enough below the value

of the property to justify the risk of default.

11.     Defendants **TRIMM** and **DUNLAP** knew that in order to make the lenders

believe that the properties in question were more valuable than they actually were, they would

have to conceal the actual purchase prices of those properties.  They knew, for instance, that the

lender would never believe that a property that contemporaneously sold for $55,000 was actually

worth $75,000.  Thus, to conceal the true value of the property, as reflected by the purchase

price, and to inflate the value for purposes of obtaining a loan, **TRIMM** and **DUNLAP** falsely

represented that the loans being sought were "refinance" loans and that the persons applying for

those loans already owned the properties.  **TRIMM** and **DUNLAP** then falsely represented that

the properties in question were worth substantially more than the contemporaneous purchase

price by securing an inflated appraisal of those properties.  Furthermore, in order to deceive the

lenders as to the real value of the subject properties, Defendants instructed various appraisers to

appraise the subject properties at a specified price, a price high enough to bring the loan-to-value

ratio down so that the purchaser could qualify for a loan.

12.     The appraisers understood that they had to appraise the subject properties at the

prices specified by the Defendants if they wanted to keep getting business from those individuals.

The appraisers earned anywhere from $325.00 to $525.00 per appraisal.  These appraisers also

understood that they had to list the persons purchasing the properties as the "owners" of those

properties even though those individuals did not hold title to the properties.  In addition, these

appraisers frequently represented that there were no prior sales involving the subject properties

within the last year (or, in some cases, the last three years), despite the fact that many of these properties had in fact been sold just a few months prior to the appraisal.

13.     After receiving these appraisals, **DUNLAP**, on behalf of Heart of Georgia Financial Services, submitted them to lenders in order to falsely persuade the lenders that loan applicants were the true owners of the subject properties and that the value of those properties substantially exceeded their actual value (as represented by the sales price).

14.     In addition, **DUNLAP** and **TRIMM** made numerous other misrepresentations to the lenders in order to persuade them that the loans were truly "refinance" loans. For instance, **DUNLAP** represented on the loan applications that the loan applicant already had an existing mortgage on the property in a certain amount, usually an amount equal to the actual purchase price of the property. And, because many of the lenders required the mortgage broker to provide a "verification of mortgage" on refinance loans, Defendants **TRIMM** and **DUNLAP** falsified verification forms, with **TRIMM** falsely representing that Legacy maintained mortgages on the subject properties.

15.     For the scheme to work, however, the defendants also needed the assistance of a licensed attorney because the lenders required each loan applicant to obtain title commitment insurance before a loan would be approved. Had an attorney performed a bona fide title search of one of the subject properties, he or she would have discovered that the person applying for the loan was <u>not</u> the actual owner of the subject property. Furthermore, the attorney would have also discovered that there were no mortgages on the property because of the absence of any security deeds in the record. Thus, the closing attorney, Al Lewis, part-owner of Heart of Georgia Financial Services, covered up their misrepresentations about the actual ownership of the

7

property by falsely indicating on the title commitment insurance forms that the loan applicant

already owned the property and that any security deeds to the mortgagor would be cancelled.

Lewis, however, knew that these individuals were not the actual owners of the property and he

knew that there were no security deeds to cancel because no security deeds had ever been filed by

any mortgage holder.

16.     By falsely couching these loans as "refinance" loans, and by submitting false

documents that purportedly substantiated the factual representations in the loan applications,

Defendants were able to convince a number of mortgage lenders to issue loans to a number of

purchasers who otherwise would not have qualified for those loans.

17.     As a result of this scheme to mislead these mortgage lenders into believing that

these loans were "refinance" loans rather than original purchase loans, these lenders were forced

to absorb the costs of these high-risk loans, and the consumers who obtained the loans were

placed at high-risk of default because they lacked the resources to pay off the subject loans.

Those involved in the fraudulent scheme, however, were able to profit from these fraudulent

transactions by increasing the volume of their respective businesses:  the mortgage broker was

able to generate commissions on loans that otherwise would have never been made; those selling

the mobile homes were able to sell mobile homes and/or mobile home-land packages to buyers

who otherwise could not have purchased such property because of their lack of assets; the real

estate appraisers were able to generate fees for appraisals that otherwise would have been

unnecessary; and the closing attorney was able to generate attorneys' fees for each of the

purchases.

8

## THE WIRE COMMUNICATION

18.     On or about the following dates, in Laurens County, in the Southern District of

Georgia and elsewhere, the Defendants, **RICK TRIMM, SR.,** and **RYAN DUNLAP,** aided and

abetted by others, for the purpose of executing, and attempting to execute, the scheme and

artifice to defraud and to obtain money by false and fraudulent pretenses, representations, and

promises, did cause to be transmitted, by means of a wire communication in interstate commerce,

specifically, by facsimile, the following described writings, signs, signals, pictures, and sounds,

to-wit::

| DATE | SOURCE | RECIPIENT | ITEM WIRED |
|------|--------|-----------|------------|
| November 11, 2002 | Wachovia Mortgage Corporation, Waterbury, CT | Al Lewis, Dublin, GA | Closing Instructions for M.B.'s mortgage refinance loan |

All done in violation of Title 18, United States Code, Sections 2 and 1343.

A True Bill.

_____
Foreperson

_____
LISA GODBEY WOOD
UNITED STATES ATTORNEY

_____
Joseph D. Newman
Assistant United States Attorney
Chief, Criminal Section

Frederick W. Kramer
Assistant United States Attorney
Senior Litigation Counsel


Richard Woolsby
Assistant United States Attorney
Augusta Branch Office Chief


Stephen K. Marsh**
Assistant United States Attorney


**Denotes lead counsel